F. A. Gillespie and Sons Company v. Commissioner.
F. A. Gillespie & Sons Co. v. Commissioner
Docket Nos. 110365, 112048.
United States Tax Court
1944 Tax Ct. Memo LEXIS 81; 3 T.C.M. (CCH) 1073; T.C.M. (RIA) 1073; October 13, 1944
*81 Harold E. Rorschach, Esq., for the petitioner. Stanley B. Anderson, Esq., and L. R. Van Burgh, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined against the petitioner deficiencies in income tax of $17,049.16 and $5,631.19 for 1937 and 1939, respectively. The issues presented by the pleadings are whether the respondent erred: (1) in determining that the petitioner realized a taxable gain of $45,780.73 on the sale in 1937 of certain oil and gas leases known as the Placedo leases; (2) in determining a taxable gain of $34,151.83 on the sale in 1939 of a lease known as the Shear lease; (3) in not allowing as deductions for interest the amounts of $4,612.50 and $9,826.88, paid in 1937, and the amounts of $4,612.50 and $5,896.13, paid in 1939, pursuant to a contract made in 1929, whereby the petitioner acquired certain properties; (4) in not allowing as deductions in 1937 and 1939, additional Oklahoma income taxes of $2,758.28 and $810.96 for the respective years, which were determined and paid in subsequent years: (5) in not allowing as deductions in 1937 and 1939, additional Oklahoma corporation license fees of $448 *82 and $319 for the respective years, which were determined and paid in a later year; and (6) in not allowing as deductions for 1937 and 1939, the amounts of $7,842.48 and $1,660, respectively, representing losses sustained by the petitioner on oil and gas leases which petitioner surrendered in the respective years. At the hearing the respondent conceded that the petitioner was entitled to deduct the losses involved in issue No. (6). This leaves the other five issues for determination. Findings of Fact as to Placedo Leases The petitioner is an Oklahoma corporation, organized in 1920, and has its principal office in Tulsa. Its income tax returns for the years in controversy were prepared from books kept on the accrual basis and were filed with the Collector for the District of Oklahoma. In 1937 the petitioner was the owner of 1/2 of a 7/8 working interest in eleven oil and gas leases on slightly over 1,400 acres of land, situated in the Placedo Oil Field, in Victoria County, Texas. The Superior Oil Corporation owned the other half of the 7/8 working interest. The latter had drilled all the wells on the leases (except the first well, which was drilled by petitioner), and conducted the *83 actual operation of the properties. The petitioner and Superior Oil Corporation each bore one-half of the drilling and development costs. In acquiring its interest in the leases, the petitioner incurred no original or independent cost, or if it did, such cost was nominal and was not capitalized. Effective as of June 15, 1937, the petitioner sold its interest in the Placedo leases, including its interest in the leasehold equipment thereon, to Superior Oil Corporation, for a cash consideration of $200,000, with a reservation of 1/8 of 7/8 of the oil and gas to be produced from the leases, until a sum of $275,000 be received by petitioner from such reservation. No reservation was made with respect to the equipment. The discovery well in the Placedo Field was completed by petitioner on April 10, 1935, and was on one of the leases involved in the sale to Superior. By about October 1936, that lease, covering approximately 170 acres, had produced out and was abandoned. At the time of the sale there were 15 or 16 producing wells on the eleven tracts, and all of the leases were producing, except the one previously mentioned. Production was from the Greta sand, which had an overall thickness *84 in the eleven tracts of an average of about 9 feet. The Greta sand was at approximately the top of the Frio sand, which was productive in the Placedo Field at the time of the sale, and was one of the most important producing sands in that part of Texas. There were also other deeper, known producing sands in that part of the state which, so far as shown, have never been tested in the Placedo Field. The greater part of the oil produced from the eleven leases had a gravity of 23 degrees. At the time of the hearing in these proceedings, only two of the leases, covering 211 acres, were producing. The following is a statement of the number of barrels of oil produced from the Placedo leases from the beginning of production, in 1935, to the close of July 14, 1937, 1/2 of 7/8 of the net proceeds, and 1/8 of 7/8 of the net proceeds: 1/2 of 7/8
1/8 of 7/8
Barrels
of Net
of Net
of Oil
Proceeds
Proceeds
1935
56,537.35
$19,787.32
$ 4,946.83
1936
133,872.74
47,714.29
11,928.57
1937 - through
June 14
73,838.33
31,224.06
7,806.01 Production from the leases was restricted, or prorated, during the latter part of 1936 and the years 1937 and 1938. The following is *85 a statement of the amounts received by petitioner from its retained interest in the Pla edo leases: 1937 - June 15 to Dec. 31
$14,650.14
1938
28,500.92
1939
16,939.56
1940
13,916.63
1941
11,442.04
1942
9,320.31
1943
13,363.69
1944 - through March
3,056.90
$111,190.19
The fair market value on June 15, 1937, of the interest reserved or retained by petitioner in the Placedo leases was at least $100,000. Prior to and including 1937 to the date of the sale of the Placedo leases, the petitioner capitalized development costs in the amount of $142,467.80. In its income tax return for 1935, 1936 and 1937, the petitioner took deductions for depletion on the percentage basis, on the Placedo leases, of $5,441.51, $10,104.98, $4,126.80, respectively, or a total of $19,673.29. The petitioner's interest in the leasehold equipment, included in the sale of the leases, cost it $120,403.46, and deductions for depreciation thereon were taken for 1935, 1936 and 1937, in the respective amounts of $1,466.27, $4,611.61 and $4,200.86, or a total of $10,278.74. On its income tax returns for 1935, 1936 and 1937, the petitioner reported, for income tax purposes, net losses of $18,644.65, *86 $27,243.77 and $893.57, respectively. In its income tax return for 1937, the petitioner reported a loss of $37,181.64 on the sale of its interest in the Placedo leases and the equipment thereon, computed in the following manner: Cash received
$200,000.00
Cost of lease-
hold equip-
ment
$120,403.46
Less: Deprecia-
tion
10,278.74
$110,124.72
Development
costs
142,467.80
Less: Amortiza
tion
15,410.88
127,056.92
237,181.64
Loss
$ 37,181.64
In determining the deficiency for 1937, the respondent determined that the petitioner had claimed, and had been allowed, depletion in the amount of $5,441.51 for 1935, and $10,104.98 for 1936, and was entitled to a depletion allowance for 1937 of $5,717.12, instead of $4,126.80 as taken in its return for that year, or a total depletion allowance on the leases to the date of the sale of $21,263.61. The respondent further determined that the interest in the leases reserved by petitioner had a fair market value of $100,000 at the time of the sale, and determined a taxable gain on the sale of $45,780.73, computed as follows: Cash received
$200,000.00
Deduct: Adjusted Basis: Development costs
$142,467.80
Depletion allowable
21,263.61
$121,204.19
Leasehold equipment
120,403.46
Depreciation allowed
10,278.74
110,124.72
$231,328.91
Less: Amount allocated to
property reserved: 100/300 of $231,328.91
77,109.64
154,219.27
Taxable gain
$ 45,780.73
*87 Opinion The petitioner's principal contention is that, in determining gain from the sale of its interest in the leases, it is entitled to a return of its total costs - development and leasehold equipment - before any taxable gain can be said to have been realized. The respondent concedes that in determining gain the petitioner is entitled to the full recovery of the depreciated cost of the leasehold equipment, and that he erred in that respect in his determination of deficiencies herein. , affirming . However, he contends that the development costs are to be reduced by previously allowed depletion and that the remainder thereof is to be allocated between the interest sold and the interest retained, with the latter having a fair market value of $100,000 at the time of the sale. Respecting the basis for determining gain or loss, the Revenue Act of 1936 provides as follows: SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * * * *
(b) *88 Adjusted Basis. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. (1) General Rule. - Proper adjustment in respect of the property shall in all cases be made - * * * * *
(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws. * * * The corresponding provisions of the 1938 Act are identical with the foregoing. The concession of the respondent eliminates the controversy respecting the return of equipment costs, except that the petitioner now claims that such costs are not to be reduced by the depreciation allowances of $10,278.74 taken and allowed, and used by it and the respondent in computing the gain on the sale. The petitioner's claim is predicated on the contention that it obtained no tax benefit from the allowances, since its returns for the years in which the allowances were made showed net losses. The petitioner's position cannot be sustained. *89 ; , affirming . As was pointed out in , the Supreme Court in , in effect overruled , which is here relied on by petitioner. The petitioner further urges that if depreciation is to be used to reduce the cost of leasehold equipment, then only the amounts of $1,099.70, $3,458.70 and $3,150.67 should be used as the correct amounts of depreciation allowable for the years 1935, 1936 and 1937, instead of $1,466.27, $4,611.61 and $4,200.86, respectively, taken by it and allowed by respondent for such years. In effect, the petitioner seeks to reduce the total depreciation allowances with respect to the equipment from $10,278.74 to $7,709.07. In support of this contention, the petitioner relies on opinion *90 testimony to the effect that depreciation was at the rate of about 10 percent per annum, with a 25 percent salvage value. Under the decision in , any reduction in depreciation for 1935 and 1936 is now clearly precluded. If, under that decision, reduction is not also precluded for 1937, we are unable, on the record made, to hold that the amount taken by petitioner and allowed by respondent for that year was not sustained, and properly allowable. Aside from being informed that the equipment involved was leasehold equipment, we have not been furnished any information with respect to it opinion as to what was a proper rate of depreciation or what was the proper amount for salvage. The only evidence we have as to the amount of the petitioner's investment in the equipment, on which depreciation is to be computed from the beginning of 1937 to the time of the sale on June 15, is found in schedules attached to petitioner's income tax returns for 1936 and 1937. These show that its investment at December 31, 1936, was $62,906.75. The schedule attached to the 1937 return shows that at some undisclosed *91 time or times between January 1 and June 15, 1937, the petitioner's investment was increased by $57,496.71, making its total investment $120,403.46, on the latter date. If the equipment represented by the increased investment was acquired at or about the beginning of 1937, depreciation computed on what the petitioner now claims is the proper basis results in an amount approximately the same as that deducted in the return. In view of the foregoing, we conclude that, in computing the gain or loss on the sale of the petitioner's leasehold equipment, the cost of $120,403.46 is to be reduced by depreciation allowances of $10,278.74. For the purpose of determining the amount of gain realized upon the disposition of the leases involved herein, the petitioner makes two contentions with respect to development costs, one that the full amount of such costs constitutes basis, without any reduction for prior depletion allowances, and the other, that no part of such costs is to be allocated to the oil payment reserved and left for recovery through depletion allowances as the reserved oil is produced. With respect to prior depletion, it is argued, first, that such depletion did not offset taxable *92 income in the respective years in which claimed and allowed, and no tax benefit having been received by reason of the depletion allowances, development costs should not be reduced for the purposes here. The holding above, as to the effect of petitioner's failure to receive a tax benefit from depletion allowances on the physical equipment, is equally applicable to the contention here with respect to depletion, and petitioner's first argument is therefore without merit. It is argued, next, that petitioner's interest in the leases had been acquired without cost, its only cost with respect to the said leases being development costs, expended after acquisition; that depletion was allowable with respect to the cost of the mineral only and not to the development costs; and that the cost of the leases being zero, the depletion allowances could not effect any reduction of basis, citing . Under the applicable regulations, article 23 (m)-16 of Regulations 94, a taxpayer, at its option, may capitalize intangible drilling and general development costs, in which case such costs are recoverable through depletion allowances, or may charge *93 such costs to expense in the year in which expended. Drilling and general development costs which are capitalized, and are not represented by physical property, are for depletion purposes to be treated as a part of the leasehold costs, just as much as the original cost of the leases themselves, and in like manner are recoverable through depletion allowances, even though such allowances are made on the percentage basis. ; . There being no showing that any of the items making up the total of the development costs here under consideration represented the cost of any physical property, or were improperly classified as development costs within the meaning of the regulations and the cases cited above, and there being no controversy as to the computation of the amount of the depletion allowances, we hold that in determining gain or loss on the sale herein the development costs of $142,467.80 must be reduced by depletion allowances of $21,263.61. The case of , is quite different *94 from the case here, and is not in point. The contention of the petitioner that the development costs, under the circumstances here, are to be applied in full against the payments received in the taxable year and no part allocated to the oil payment reserved, has been considered and decided to the contrary, in The development costs, at petitioner's option, were capitalized and, under the regulations and the cases cited above, constituted cost to it of its interest in the said leases and the oil reserves covered thereby. Part of such interest the petitioner parted with in the taxable year for cash; the remaining part was reserved, and was to be realized as the reserved oil was produced. Allocation of the development cost between the interests sold in the taxable year and the interest reserved was proper and correct. The petitioner received $200,000 for the interest disposed of in the taxable year, and after careful consideration of the evidence submitted as to the value of the interest reserved, we have found as a fact that its *95 fair market value was at least $100,000, which was the value determined by the respondent and used by him in his computation. The respondent's allocation of the development costs on the basis of those amounts is accordingly approved. Findings of Fact as to the Shear Lease In 1939 the petitioner was the owner of a lease, known as the Shear lease, which had no original or independent cost to petitioner. During 1939 the petitioner sold the lease, with the leasehold equipment thereon, for $49,950 cash, and retained an interest in 1/8 of 7/8 of the production therefrom until the additional amount of $100,000 should be received. Leasehold development costs to the time of the sale amounted to $26,937.98. Of that amount, $22,439.71 had been capitalized, and the balance of $4,498.27 had been omitted by petitioner. Depletion deductions taken by petitioner, and allowed by respondent, with respect to the lease amounted to $1,345.85. The costs of the leasehold equipment to the time of the sale was $9,665.92, and depreciation claimed and allowed with respect thereto was $483.30. In its income tax return for 1939, the petitioner reported a gain of $19,449.66 on the sale of the lease. In determining *96 the deficiency, the respondent determined that the gain on the sale was $34,151.83. In making that determination, he determined that the depreciated cost of the leasehold equipment was $9,182.62, that the leasehold cost, inclusive of development cost, was $26,937.98, and was to be reduced by depletion allowances in an amount of $1,345.86, which would make a total net cost of the lease and the leasehold equipment of $34,774.75. He further determined that the value of the payments of $100,000 to be made from the 1/8 of the 7/8 interest retained by petitioner was $60,000, and that the value of the interest sold was $49,950, or $109,950 as the total value. Determining that the value of the interest sold represented 45.43 percent of the total value, he allocated such percentage, or $15,798.17 of the total cost of $34,774.75, as determined by him, to the cost of the interest. The balance of such cost, as determined by him, or $18,976.58, he allocated to the interest retained. Subtracting from $49,950, the selling price of the interest sold, the amount of $15,798.17, the portion of the total cost allocated to such interest, the respondent arrived at the gain stated above. The parties have *97 stipulated that at the time of the sale the fair market value of the interest retained by petitioner in the lease was $5,000, instead of the value of $60,000, determined therefor by respondent. Opinion The petitioner makes substantially the same arguments with respect to the respondent's method of determining gain on the sale of the Shear lease as was made respecting the gain on the sale of the Placedo leases supra. The pertinent conclusions reached by us there are applicable here. A recomputation of the gain on the sale of the Shear lease will be made accordingly, with $5,000 as the fair market value of the retained interest in the Shear lease for the purpose of allocating adjusted cost of the leasehold between the interest sold and that retained. Findings of Fact as to Payments Made Pursuant to Contract Under Which Petitioner Acquired Certain Properties Pursuant to a contract entered into on May 15, 1929, between petitioner and F. A. Gillespie and Maud Gillespie, husband and wife, the last two named transferred to petitioner the following properties, of the indicated values, which they owned jointly: U.S. Liberty Loan bonds and Port
of New Orleans State bonds
$1,172,000.00
Empress Building, Tulsa, Oklahoma
150,000.00
Sundry Lands and lots located in
Oklahoma
22,512.00
Cash and accounts receivable
94,365.22
Sundry stocks
25,363.00
Total
$1,464,240.22
*98 The cost of these properties to F. A. Gillespie and Maud Gillespie equaled or exceeded the above-stated fair market value. Under the terms of the contract, the petitioner agreed to pay F. A. Gillespie $15,000 per year, for life, and to pay Maud Gillespie $15,000 per year, for life, and, in addition, guaranteed to her that she should receive annually for life, as dividends, an amount equal at least to $10,000, and that, if for any reason funds should not be available for the declaration of dividends in that amount, the petitioner would pay such sum to her. F. A. Gillespie was born on August 22, 1868, and Maud Gillespie, on June 9, 1872. An annuity upon the life of a male individual born in the United States on August 22, 1868, which would have paid $15,000 per annum to him for his life, could have been purchased from a reputable life insurance company doing business in the United States on May 15, 1929, for the sum of $153,750. An annuity upon the life of a female individual born in the United States on June 9, 1872, which would have paid $15,000 per annum to her for her life, could have been purchased from a reputable life insurance company doing business in the United States on *99 May 15, 1929, for the sum of $196,537.50. Under the terms of the contract of May 15, 1929, the petitioner paid F. A. Gillespie a total of $54,375 for the years 1929 through 1932, and for the years 1933 through 1942, the amount of $15,000 per annum. The petitioner paid Maud Gillespie for 1932, and for certain settlements to that time, a total of $34,891.01. For 1933, she was paid $25,000, and in November of that year she agreed that the petitioner might cease paying her the additional $10,000 per annum, guaranteed to her as dividends or otherwise to be paid to her by petitioner. However, in 1934, she was paid $20,000. For the years 1935 through 1940, she was paid $15,000 per annum. She died during 1941, and for the portion of the year ending with September, she was paid $12,250. Opinion The petitioner urges that the payments of $15,000 made by it to F. A. Gillespie and to Maud Gillespie in each of the years 1937 and 1939, under the contract of May 15, 1929, consisted, in their hands, partly of a return of capital and partly of interest, and that the portions of such payments as represented interest were deductible by it as such in the years in which paid. The deductions sought in *100 each of the taxable years, as set out in the petitions, are $4,612.50, on account of the payments made to F. A. Gillespie, and $9,826.88 for 1937 and $5,896.13 for 1939, on account of the payments made to Maud Gillespie. On brief, the deduction claimed as to payments made to Maud Gillespie for 1937 is reduced to $5,896.13, making it the same in amount as the deduction claimed for 1939. The contract of May 15, 1929, between petitioner and F. A. Gillespie and Maud Gillespie, was before us in . It was there held that the $15,000 received by F. A. Gillespie was an annuity and, on the facts, taxable to Gillespie, under section 22 (b)(2) of the Revenue Act of 1934, in its entirety. The contract was again before us in , in which case the proof as to the character of the payments to the petitioner under the said contract was materially different from that in the prior case of F. A. Gillespie. On review by the United States Circuit Court of Appeals for the Ninth Circuit, our conclusions therein were reversed in part and affirmed in part, the ultimate decision being *101 that the payments by Maud Gillespie to petitioner, under the contract of May 15, 1939, were in part the cost of a specified annuity during her life, and in part a gift by her for the benefit of her children and grandchildren, and that under section 22 (b)(2) of the Revenue Act of 1934, $5,896.13, which was an amount equal to 3 percent of the amount found as the cost of the $15,000 annuity, was taxable to her. The purchase of an annuity does not give rise to a debtor-creditor relationship so as to constitute any portion of the payments made under the said annuity contract interest, see and compare ; affd., ; and ; affd., , and the fact that Congress has seen fit, in section 22 (b)(2) of the Revenue Acts of 1936 and 1938, the acts here applicable, to exclude from gross income that part of the amounts received under annuity contracts as exceeds 3 percent of the cost of the said annuity until the total of the excluded amounts equal the cost of the said annuity, gives no color to *102 any claim that the portion of the annuity payments not so excluded from gross income is interest. The claim of the petitioner that a portion of the annuity payments made in each of the taxable years to F. A. Gillespie and to Maud Gillespie under the contract of May 15, 1929, was interest, and therefore deductible in computing its net income for those years, is, we think, clearly without merit and is accordingly denied. Findings of Fact as to Additional Oklahoma Income Taxes On March 1, 1941, the Oklahoma Tax Commission determined an additional state income tax of $2,758.21 against the petitioner for 1937, and petitioner paid the tax. On May 5, 1943, the Commission determined an additional income tax of $810.96 against the petitioner for 1939, and petitioner paid it. These additional state income taxes have not been claimed by petitioner as deductions in any of its Federal income tax returns Opinion The respondent concedes that the petitioner filed its income tax returns on the accrual basis for the years in controversy and does not make any contention that Oklahoma income taxes are not proper deductions in determining taxable net income for Federal income tax purposes. The state *103 income taxes here in question accrued in the years 1937 and 1939, respectively, and the petitioner is entitled to the deductions claimed. Findings of Fact as to Additional Oklahoma Corporation License Fees In January 1942, the Oklahoma Tax Commission made a claim against the petitioner for additional corporate license fees for the years 1931 through 1941, on the ground that in making its annual reports the petitioner had omitted certain properties. The petitioner made a computation of the fees which it considered were due and submitted it to the Commission, which accepted it as correct. The Commission thereupon entered an order for additional corporate license fees of $448 for 1937, and $319 for 1939. These amounts, along with additional license fees for other years, were paid on or before January 24, 1942. Thereafter, a proceeding was instituted in the District Court of Oklahoma County, Oklahoma, to give finality to the order of the Commission and to forestall a reopening of the matter. That proceeding was a formality and involved no contest. The additional license fees paid by petitioner for 1937 and 1939 have not been claimed as deductions in any of its Federal income tax returns. *104 Opinion The respondent concedes that the additional license fees in the amounts of $448 and $319 paid for 1937 and 1939, respectively, were not contested by petitioner in the court proceeding. He does contend, however, that petitioner contested the said fees before the Oklahoma Tax Commission and that under the decision in , they were therefore not properly accruable for and deductible in the respective years for which paid. In , the taxing authorities of Mississippi were attempting, under the authority of a certain state statute, to collect from the taxpayer a gasoline tax on a solvent used by it. The taxpayer, while denying the applicability of the statute to it and contesting in court the efforts of the state authorities to collect the tax, nevertheless, on advice of counsel, accrued on its books as of the end of 1937 a certain amount as gasoline tax for that year. Thereafter the courts sustained the taxpayer's position that the statute did not apply to it, and the amount accrued was never paid. The holding by the United *105 States Supreme Court that the amount of the accrual made under the circumstances of that case was not a proper deduction is not, in our opinion, controlling here. In the instant proceedings, the petitioner does not appear to have denied liability for license fees but appears to have disagreed with the Oklahoma Tax Commission only as to the correctness of the amounts claimed by the Commission for the respective years, and the Commission, in entering its order, accepted petitioner's computation. The petitioner is here claiming as deductions only the amounts the Commission concluded were correct and which the petitioner paid. Under the circumstances presented, we think the petitioner is entitled to deduct the additional license fees so paid. Decisions will be entered under Rule 50.